IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAVAR CALVIN, WILLIAM VIRBLE MOORE, and CHARLES DAVIS, | ) ) ) |
| Plaintiffs, | ) ) |
| | ) No.     03 C 3086 |
| v. | ) |
| | ) Judge Robert W. Gettleman |
| SHERIFF OF WILL COUNTY, | ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Javar Calvin, William Moore and Charles Davis, individually and on behalf of all others similarly situated, filed a class action on May 8, 2003, pursuant to 42 U.S.C. § 1983, challenging certain provisions of the strip search policy of defendant, the Sheriff of Will County ("Sheriff"). In its Memorandum Opinion and Order dated May 17, 2004, this court granted plaintiffs' motion to certify two subclasses of plaintiffs, and denied plaintiffs' motion to certify a third class. Calvin v. Sheriff of Will County, 2004 WL 1125922 (N.D.Ill. May 17, 2004).

Plaintiffs have moved for summary judgment on liability regarding both subclasses pursuant to Fed. R. Civ. P 56, arguing that defendant's strip search policy violates the Fourth Amendment. Defendant has filed a motion to strike portions of plaintiffs' Local Rule 56.1 statement, arguing that they contain legal conclusions and immaterial facts. For the reasons stated below, the court grants plaintiffs' motion for summary judgment and denies defendant's motion to strike as moot.

## FACTS[1]

The instant action concerns the strip search policies of the Will County Adult Detention

Facility ("WCADF"). This court previously certified two subclasses in the instant action.

Subclass I[2], the "Post-Arrest Strip Search" subclass, is defined as:

Any person who, from May 8, 2001, to the date of entry of judgment has been, is, or will

be:

> Arrested on a warrant issued for failure to appear in a misdemeanor
> or traffic case and, following arrival at the Will County Adult
> Detention Facility, is or was strip searched without any
> individualized finding of reasonable suspicion or probable cause
> that he or she was concealing contraband or weapons. Calvin,
> 2004 WL 1125922, at * 4.

Subclass II, the "Post-Release Strip Search" subclass, is defined as:

Any person who, from May 8, 2001, to the date of entry of judgment has been, is, or will

be:

> In the custody of the Sheriff of Will County on a traffic or
> misdemeanor charge (or on a warrant issued for failure to appear
> on a traffic or misdemeanor charge), taken to court from the Will
> County Adult Detention Facility, ordered released by the court, or

---

[1]Unless otherwise noted, the following facts, taken from the parties' L.R. 56.1 statements and attached exhibits, are not in dispute. The court notes that both parties expend unnecessary energy attacking each other's L.R. 56.1 statements. The court agrees that several of plaintiffs' statements of fact contain legal conclusions. For example, paragraph 13 concludes that a "bench warrant" is equivalent to a "failure to appear warrant" described in 725 ILCS 110/3. The court also agrees, however, that several of defendant's responses to plaintiffs' statements of fact state are improper. For example, many of defendant's responses state, "Admitted in part and denied in part," but do not deny the statement. Instead, defendant attempts to insert additional, non-responsive facts or legal argument in its response. The court need not resolve the issue, however, because, as discussed below, there is no dispute about any material issue of fact.

[2]The court notes that the subclasses have been renumbered to reflect that the court denied certification of subclass I.

otherwise became entitled to immediate release, was returned to the Will County Adult Detention Facility to be processed out of the custody of the Sheriff of Will County, and was strip searched without any individualized finding of reasonable suspicion that he or she was concealing contraband or weapons. Id. at *6.

Policy No. 5080 of the WCADF Policy and Procedures ("Policy 5080") contains search policies for the WCADF, including policies for visual body cavity searches and strip searches. Policy 5080 states that a visual body cavity search is "the visual inspection of the anal or vaginal area," and must be "conducted by trained staff in private." Policy 5080 limits visual cavity searches to instances when there is "a reasonable belief that the inmate is carrying contraband or other prohibited material." Under Policy 5080, a strip search "requires the removal or arrangement of any clothing so that the entire body or party of the body may be viewed." Strip searches may not be performed on persons arrested for traffic, ordinance/regulatory or misdemeanor offenses, except in cases involving weapons or a controlled substance arrest. A strip search may be performed "if there is reasonable belief that the individual is concealing a weapon or concealed substance." Policy 5080 also provides two instances when a strip search may be conducted absent reasonable suspicion: (1) when an arrestee is "remanded to the custody of the Sheriff on any warrant"; and (2) after "transports outside [the facility]."[3] Plaintiffs in the instant action challenge these two exceptions.

---

[3]Paragraph J of Policy 5080 states,
"Strip searches may be performed on all inmates, [sic] remanded to the custody of the Sheriff on any warrant or mittimus for failure to post bond, or any subject arrested without warrant that will be housed in the WCADF. Inmates already in custody, [sic] are subject to strip search during discipline moves and routine shakedowns or whenever there is reasonable belief that an inmate has come in contact with contraband when unsupervised. (i.e. contact visits, transports outside or upon returning from any furlough or temporary release.[)]"

3

Sergeant Brain Fink ("Fink"), director of training and accreditation for the WCADF, wrote the original draft of Policy 5080 in 1989. Fink testified that during a strip search an inmate is first required to remove all of his clothing and shake it out or hand it to the guards to search the pockets. The inmate is instructed to show his hands, lift his arms, run his hands behind his ears, and lean forward and shake his hair. The inmate in then asked to show his hands again, turn around and show the bottom of his feet, and bend over and spread the cheeks of his buttocks with his hands. Next, the inmate is told to stand up, face the officer, and lift his genitals. Finally, the inmate shows his hands again and is allowed to redress.[4] All stip searches at the WCADF are conducted in private areas and by an officer of the same gender as the person being searched.

Subclass 1 challenges post-arrest strip searches. All persons arrested pursuant to a warrant, including a failure to appear ("FTA") warrant, are stripped searched if they are unwilling or unable to post bail. After being strip searched, these individuals are housed in the "E"pod ("E-pod") at the WCADF, which is a direct observation section of the facility consisting of 120 cells. Individuals who are not strip searched when they arrive at the WCADF, including those arrested on misdemeanor or traffic offenses not based on warrants, are held in the booking area. Defendant asserts that the need to hold arrestees in booking area has resulted in an overcrowding

---

[4]The court notes that defendant denies plaintiffs' L.R. 56.1 statement that the strip search conducted at the WCADF is defined as a "visual cavity search" because Policy 5080 defines them separately. Fink, however, who was produced by defendants pursuant to Fed. R. Civ. P. 30(b)(6) to answer questions about the policies regarding strip searches applied at the WCADF , testified at his deposition that a strip search as conducted at the WCADF includes "what is referred to in Policy 5080 as a visual cavity search," and that there is no difference between the two searches. Defendant's effort to create a disputed issue of fact on this question is unpersuasive.

problem in the booking area, an area that was not intended to house inmates, and that even inmates in the E-pod are usually placed in a cell with another inmate due to overcrowding.

Subclass II challenges post-release strip searches performed on detainees who are ordered released by a judge and then returned to the WCADF to be processed and to retrieve their belongings. Inmates who are taken out of the WCADF to court are not supervised by Will County personnel the entire time that they are at the courthouse. While at the courthouse they are placed in a housing unit cell with other inmates and have contact with people other than Will County Sheriffs. In particular, inmates may have contact with their relatives and their lawyers.

Fink testified that all persons returned from court to the WCADF are strip searched, even those who have been ordered released by a judge. According to Fink, persons ordered released must be searched because they are "going back in the inmate population and having contact with inmates" while they are being processed before being released and in order to collect their personal possessions. Processing includes checking whether the individual has any outstanding cases, and whether there are any warrants or "holds" from other jurisdictions. Fink also testified that there is a reasonable belief that every inmate who returns from court is carrying contraband or other prohibited material. Defendant changed its post-release procedures since the filing of the instant action. David Van Dyke ("Van Dyke"), deputy chief sheriff for the County of Will, submitted an affidavit attesting that subsequent to September 15, 2004, persons returning from court after being ordered released are not strip searched as a matter of course. Instead, "they are given the option of remaining in a holding area and having facility personnel retrieve their personal belongings from their cell, or they are allowed to return to their cell to obtain their belongings themselves, but after consent, they are strip searched before entering the cell area."

5

## SUMMARY JUDGMENT STANDARD

A movant is entitled to summary judgment under Rule 56 when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Unterreiner v. Volkswagen of America, Inc., 8 F.3d 1206, 1209 (7th Cir. 1993). Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. See Fed. R. Civ. P. 56(c); Becker v. Tenenbaum-Hill Associates, Inc., 914 F.2d 107, 110 (7th Cir. 1990). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. See Fisher v. Transco Services-Milwaukee, Inc., 979 F.2d 1239, 1242 (7th Cir. 1992).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Stewart v. McGinnis, 5 F.3d 1031, 1033 (7th Cir. 1993). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252.

## DISCUSSION

In the instant case, despite each party's attempt to create them by inserting legal conclusions and argument into their L.R. 56.1 statements, there are no material facts in dispute.

Indeed, there are very few facts at issue. Plaintiffs' motion for summary judgment on the issue of liability is based almost entirely on two pieces of evidence: (1) Policy 5080; and (2) Fink's deposition testimony regarding the policies and practices concerning strip searches at the WCADF. It is clearly established that Policy 5080 required the searching of members of subclasses I and II, and that these policies were effectuated by defendant's personnel. Defendant concedes that it had no reasonable suspicion that any of the class members had contraband or weapons. The question then is whether the strip search policies violated the class members' Fourth Amendment rights.

## I.    Subclass I - Post-arrest search

In their subclass I claim, plaintiffs challenge defendant's policy of strip searching every person arrested on an FTA warrant for a misdemeanor or traffic violation who does not post bond. Plaintiffs argue that this policy violates the Fourth Amendment because it does not require an individual determination that there is a reasonable suspicion that the particular arrestee is concealing weapons or other contraband, and that defendant's proffered justifications are not sufficient to justify a strip search that includes a visual body cavity inspection.

Plaintiffs argue that an FTA warrant does not carry with it the same probable cause finding as an arrest warrant issued for an underlying charge, and that it is not reasonable to assume that a person arrested on an FTA warrant in a traffic or misdemeanor case "will have sought to hide contraband in a spot where it can only be discovered by a strip search." According to plaintiffs, this presumption is particularly inappropriate for individuals issued FTA warrants in misdemeanor or traffic cases. Defendant responds that an FTA warrant is equivalent to any warrant and thus justifies the strip searches of all warrant arrestees. Defendant also argues that

every warrant requires it to detain arrestees who cannot post bond, and that arrestees are detained in the E-pod with the general jail population. The strip searches, assert defendant, are thus justified by the jail's legitimate security concerns. For the reasons discussed below, the court grants plaintiffs' motion for summary judgment as to subclass I.

The Supreme Court's opinion in Bell v. Wolfish, 441 U.S. 520 (1979), is the seminal detainee strip search case. Balancing "the significant and legitimate security interests of the institution against the privacy interests of the inmates," the Bell court upheld a prison policy requiring inmates to submit to routine strip searches with visual cavity inspections after every contact with a person from outside the institution. Id. at 560. Despite holding that particular policy constitutional, Bell did not validate a blanket policy of strip searching pretrial detainees. Wilson v. Jones, 251 F.3d 1340, 1342 (11th Cir. 2001) (citing Masters v. Crouch, 872 F.2d 1248, 1253 (6th Cir. 1989)); see also Tikalsky v. City of Chicago, 687 F.2d 175, 182 (7th Cir. 1982) (Bell "did not validate strip searches per se"). Rather, Bell held that pretrial detainees retain constitutional rights, including the Fourth Amendment's protection against unreasonable searches and seizures, which are subject to limitations based on the fact of confinement and the institution's need to maintain security and order. Id. at 545-46. In balancing the constitutional rights of the inmate with the interests of the penal institution, a court must consider four factors: (1) the scope of the particular intrusion; (2) the manner in which it is conducted; (3) the place in which it is conducted; and (4) the justification for initiating it. Id. at 559.

In the instant case, neither the place nor manner of the searches is problematic. Thankfully, the undisputed policy and practice of the strip searches at issue here do not involve the parade of terribles and abuses presented by other strip search cases. See, e.g., Doe v. Calumet

8

City, 754 F. Supp. 1211, 1214-15 (N.D.Ill. 1990) (female arrestees subjected to "offensive touching," digital cavity searches, visual observation by male officers while being strip searched, and fondling by male officers while in plain sight of male officers and others). Plaintiffs do not dispute that the WCADF searches were conducted in private by officers of the same gender, and with "tact." In addition, the WCADF personnel did not touch the detainees and there have been no accusations of abuse.

Plaintiffs argue that the scope of searches - which require inmates to strip naked and permit a visual cavity inspection - was not justified. Courts have repeatedly held that strip searches that include visual inspection of the anal and genital areas are inherently invasive. The Supreme Court stated in Bell that a strip search and visual inspection of inmates' body cavities "instinctively gives us the most pause." 441 U.S. at 558-59. In Mary Beth G. v. City of Chicago, 723 F.2d 1263, 1272 (7th Cir. 1983), the Seventh Circuit described strip searches as "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission." See also, Swain v. Spinney, 117 F.3d 1, 7 (1st Cir. 1997) (visual cavity searches "impinge seriously" upon Fourth Amendment values); Chapman v. Nichols, 989 F.2d 393, 395 (10th Cir. 1993) ("There can be no doubt that a strip search is an invasion of privacy of the first magnitude."); Thompson v. County of Cook, 2005 WL 1950363, at *7 (N.D.Ill. Aug. 8, 2005) ("It is beyond argument that the search involved [a strip search including visual cavity inspection] is extremely intrusive.").

Defendant must establish a sufficient "justification for initiating" such an invasive search. Bell, 441 U.S. at 559. Defendant argues that the blanket strip search policy for warrant arrestees is necessary to ensure safety at the WCADF because warrant arrestees who do not post bond

9

must be detained in the E-pod with the general jail population. Courts, beginning with Bell, have consistently held that institutional security is a legitimate law enforcement objective, and may provide a compelling reason for a strip search absent reasonable suspicion of individualized wrongdoing. See, e.g., Overton v. Bazzetta, 539 U.S. 126, 133 (2003) (maintaining institutional security is "perhaps the most legitimate of penological goals"). Courts have given prisons latitude to premise searches on the type of crime for which an inmate is arrested. See, e.g., Dufrin v. Spreen, 712 F.2d 1084, 1087 (6th Cir. 1983). When the inmate has been charged with only a misdemeanor or traffic violation, crimes not generally associated with weapons or contraband, however, courts have required that officers have a reasonable suspicion that the individual inmate is concealing contraband.

In Tinetti v. Wittke, 620 F.2d 160 (7th Cir. 1980), the Seventh Circuit affirmed the district court's holding, 479 F. Supp. 486 (E.D. Wis. 1979), that a blanket policy of strip searching people charged with a non-misdemeanor traffic violation "without probable cause to believe that she was concealing weapons or contraband on her body was a violation of the plaintiff's rights under the Fourth, Fifth, and Fourteenth Amendments of the U.S. Constitution." 479 F. Supp. at 491. The plaintiffs in Tinetti challenged a policy of the Racine County jail that required the strip search of persons arrested for non-misdemeanor traffic offenses "due to an unwillingness or inability to post bond before their initial appearance in court." 620 F.2d at 160. The Seventh Circuit adopted the district court's holding that, "[t]he intrusion on one's personal dignity occasioned by such searches requires that some justifiable basis exists." 479 F. Supp. at 491. Although Tinetti involved a search of people arrested for non-misdemeanor traffic violations only, its reasoning clearly applies to all blanket search policies, such as the one at issue here, that

10

make no distinctions among the types of crimes charged and that fail to require any level of belief that a particular arrestee is in possession of a weapon or contraband. Doe v. Calumet, 754 F. Supp. at 1219 n. 18.

In Mary Beth G., which applied the reasoning of Tinetti, the Seventh Circuit held that Chicago's policy of subjecting women, but not men, who had been arrested and detained on misdemeanor charges, to a strip search regardless of the charges against them or whether detention officers had any reasonable suspicion that a particular woman was concealing weapons or contraband, violated the Fourth Amendment. 723 F.2d at 1273. The Mary Beth G. court noted, "The more intrusive the search, the closer the government authorities must come forward to demonstrating probable cause for believing that the search will uncover the objects for which the search is being conducted." Id. at 1273 (quoting Terry v. Ohio, 392 U.S. 1, 18 n. 15 (1968)).

Other courts of appeals have also held strip searches of misdemeanor arrestees unconstitutional. See, e.g., Shain v. Ellison, 273 F.3d 56, 64-66 (2nd Cir. 2001) (policy of strip searching misdemeanor arrestees unconstitutional); Logan v. Shealy, 660 F.2d 1007, 1013 (4th Cir. 1981) (strip search unconstitutional because the officer had "no cause" to believe that DUI detainee had a weapon or contraband); Giles v. Ackerman, 746 F.2d 614, 617 (9th Cir. 1984) (per curium) ("arrestees charged with minor offenses may be subjected to a strip search only if jail officials have a reasonable suspicion that the individual arrestee is carrying or concealing contraband"); Hill v. Bogans, 735 F.2d 391, 394 (10th Cir. 1984) (strip search of a traffic offender with "no circumstances here indicating [arrestee] might possess either a weapon or drugs" was unconstitutional); Wilson v. Jones, 251 F.3d 1340, 1342 (11th Cir. 2001) (strip search policy that did not require reasonable suspicion violated Fourth Amendment).

11

## A.    FTA warrant

Defendant does not respond to any of the court of appeals cases cited by plaintiffs except Mary Beth G., which it attempts to distinguish based on the plaintiff's ability to post bond, as discussed below.  Instead, defendant argues that its search policy is distinguishable because it applies to detainees arrested pursuant to a warrant, which defendant asserts negates the need for individualized reasonable suspicion.  In support of this argument, defendant cites 725 ILCS 5/103-1(c), which provides that persons arrested for a traffic, regulatory, or misdemeanor offense, except in cases involving weapons or a controlled substance, may not be strip searched. The statute also provides, however, that this restriction "shall not apply when the person is taken into custody or remanded to the sheriff or correctional institution pursuant to court order."  725 ILCS 5/103-1(j).  Illinois state appellate courts have held that because FTA warrants in misdemeanor or traffic cases are "pursuant to court order," and the statutory restriction against strip searches does not apply to persons arrested on such warrants.  People v. Mitchell, 353 Ill. App. 3d 838, 840-841 (2nd Dist. 2004); People v. Johnson, 334 Ill. App. 3d 666, 672-3 (4th Dist. 2002).  Illinois courts have also held that strip searches of people arrested pursuant to FTA misdemeanor warrants do not violate the Fourth Amendment.  Mitchell, 353 Ill. App. 3d at 843; Johnson, 334 Ill. App. 3d at 673.

A federal district court is, of course, not bound by a state court's rulings on matters of federal law, including whether a state statute or county policy violates the Fourth Amendment. See, e.g., Quinones v. City of Evanston, 58 F.3d 275, 277 (7th Cir. 1995) ("A discriminatory state law is not a defense to liability under federal law; it is a source of liability under federal law.").  The question then, is whether the issuance of an FTA warrant, often referred to as a "bench

12

warrant," satisfies the constitutional requirement of reasonable suspicion to conduct a strip search.

Plaintiffs argue that although defendant is authorized to "book" a person who is arrested or surrenders pursuant to an FTA warrant, such a warrant is distinguishable from an arrest warrant issued on a new charge. Plaintiffs assert that an FTA warrant is issued upon a finding that a criminal defendant failed to comply with a condition of pretrial release, such as appearing in court, and thus cannot constitute a finding that there is a reasonable basis for a strip search. An Illinois appellate court has noted that "a bench warrant does not amount to a judicial finding of probable cause to arrest in the traditional sense, i.e., that a crime had been committed and that defendant had committed it." People v. Allibalogun, 312 Ill. App. 3d 515, 518 (2000) (citing United States v. Spencer, 684 F.2d 220, 223 (2nd Cir. 1982)).

The court agrees with plaintiffs that it is difficult to reconcile prohibiting automatic strip searches of people arrested on traffic and misdemeanor charges – as the Illinois statute, case law, and Policy 5080 all do – with allowing the strip searches of people arrested for a failure to appear regarding the identical charges. Again, defendant fails to squarely address plaintiffs' argument that defendant lacked reasonable suspicion to conduct the strip searches. Instead, defendant argues that like all warrants, "the FTA warrants are valid court orders that lawfully authorize the Sheriff to arrest and detain someone, those warrants justified the searches in this case." Defendant fails, however, to provide any persuasive argument or case law in support of its leap of logic that the searches at issue here were constitutional because plaintiffs' detentions were lawful. Defendant cites Doe v. Sheriff of DuPage County, 128 F.3d 586, 588 (7th Cir. 1997) and Corbett v. White, 2001 WL 1098054, at *7 (N.D. Ill. Sep. 17. 2001). Both of these cases,

however, address a jail's authority to detain a warrant arrestee, and do not discuss searches of detainees. Doe v. Sheriff of DuPage County and Corbertt are thus not responsive to the gravamen of plaintiffs' challenge, which is not directed at the constitutionality of their detention but their treatment while detained.

Accordingly, defendant has failed to create a triable issue of fact that arrest pursuant to an FTA warrant justifies the blanket strip search policy.

## B. Opportunity to post bond

Defendant also argues that the searches are authorized because they are not conducted until the arrestees are given the opportunity to post bond. According to defendant, this is in contrast to the searches at issue in Mary Beth G., Tinetti, and Gary v. Sheahan, 1998 WL 547116 (N.D.Ill. Aug. 20, 1998). Defendant's argument that these cases are distinguishable because the "key" in the courts' analysis "is that the detention is for a brief period awaiting bound" misconstrues the facts and the holdings in those cases. For example, the plaintiff in Tinetti was given an opportunity to post bond at the time of her arrest for speeding. 479 F. Supp. at 488. She was unable to pay bond, and was taken into custody and strip searched. Id. She was released two hours later when her uncle posted bail. Id. Defendant asserts, without support in the Tinetti opinion, that the plaintiff in that case could have avoided the strip search if she had been permitted to call her uncle earlier. The Seventh Circuit affirmed the district court's opinion that the blanket policy of strip searching detainees who did not post bond was unconstitutional, and did not limit its holding to instances in which the detainee could or would have posted bond if given another opportunity or any opportunity at all. Tinetti, 620 F.2d at 160.

14

Defendant's attempt to distinguish Mary Beth G. and Gary, on the grounds that the plaintiffs in those cases were awaiting bond is similarly unconvincing because neither holding is based on how long the arrestees were held or whether they were waiting for their bail to be paid. The plaintiffs in Gary were strip searched after being released, and thus, as the Gary court made clear, the case did not concern people awaiting bail at all.[5] 1998 WL 547116, at *12. The Seventh Circuit describes the plaintiffs in Mary Beth G. as held "in lockups" while "awaiting arrival of bail money." 723 F.2d at 1266. Defendant does not explain what would distinguish the lockups in Mary Beth G. from the E-pod in which plaintiffs here were placed. Moreover, there is nothing in the record of the instant case to suggest that plaintiffs were not expecting to be bailed out imminently.

Defendant fails to cite any case in which a court upheld a strip search policy against a constitutional challenge based on an opportunity to post bond. To the contrary, other courts have recognized that an arrestee's failure to post bond, which is often the result of limited financial resources, cannot save a constitutionally infirm search. For example, the Shain court held that neither the inability nor the refusal to post bail "creates a reasonable suspicion that the alleged offender has secreted contraband or a weapon." 273 F.3d at 65. Defendant's argument that the opportunity to post bond negates a Fourth Amendment challenge to the strip searches is not supported by the case law it cites, and is not persuasive.

---

[5] The court notes that the language from Gary quoted by defendant is a quotation from Simenc v. Sheriff of DuPage County, 1985 WL 4896 (N.D.Ill. Dec. 9, 1985), in which the plaintiffs did challenge their lack of opportunity to post bond.

15

## C. Institutional security

The most legally substantial justification offered by defendant in support of its strip search policy is institutional security, although defendant devotes scant attention to security in its brief opposing summary judgment. Maintaining institutional security as well as the safety of jail officers and inmates has been recognized as a significant interest and valid justification for strip searches. Stanley v. Henson, 337 F.3d 961, 966 (7th Cir. 2003). The Supreme Court has observed that a "detention facility is a unique place fraught with serious security dangers." Bell, 441 U.S. at 559. The Seventh Circuit agreed in Mary Beth G., concluding that "the need to assure jail security is a legitimate and substantial concern." 723 F.2d at 1273. An institutional practice claimed to infringe a constitutional guarantee must be evaluated in light of the institution's essential interest in security. Id. at 546. The Supreme Court has instructed courts to make this evaluation deferentially, giving due regard to the professional expertise of correctional officials. Id. at 548.

Although the determinations of correctional officials regarding security procedures are entitled to deference, jail officials' decisions are not immunized from scrutiny. Stanley, F.3d at 966. As a court in this district noted recently, "Officials do not have *carte blanche* to institute any policy they please under the justification of institutional security." Thompson, 2005 WL 1950363, at *7 (denying defendant's summary judgment motion arguing that visual cavity search of all detainees at jail did not violate Fourth Amendment). Several courts of appeals have made similar observations. See, e.g., Roberts v. Rhode Island, 239 F.3d 107, 113 (1st Cir. 2001) ("An indiscriminate strip search policy routinely applied ... [cannot] be justified simply on the basis of administrative ease in attending to security considerations.") (ellipsis in original; quoting Logan,

16

660 F.2d at 1013); Hill, 735 F.2d at 394-95 (Under Bell, "jail's desire to maintain security, to avoid charges of discriminatory treatment, and to promote administrative convenience simply does not justify routine strip searches in a public area of persons detained for minor traffic offenses.").

In the instant case, defendant argues that the WCADF strip searches are required "because the inmate will be placed in a portion of the facility with hundreds of other inmates in close proximity, and it is necessary to protect the safety not only of guards and other inmates, but also the safety of the person being searched." That is, because the warrant arrestees are "intermingled" with the general jail population at the WCADF, the arrestees must submit to a strip search.

Courts have frequently noted that the intermingling of inmates is a serious concern that weighs in favor of the reasonableness, and constitutionality, of the search. See Dufrin, 712 F.2d at 1087 (inmate would come into contact with general population); Logan, 660 F.2d at 1013 (noting lack of intermingling). Defendant cites to Roscom v. City of Chicago, 570 F. Supp. 259 (N.D. Ill. 1983), in which the court upheld the strip search of an arrestee who was placed in jail after being unable to post bond. Several courts, including many courts of appeals, however, have since held that intermingling alone is insufficient to justify a search without reasonable suspicion. Chapman v. Nichols, 989 F.2d 393, 396 (10th Cir. 1993); Masters, 872 F.2d at 1254; see also Wilson v. Jones[6], 251 F.3d 1340, 1341-42 (11th Cir. 2001) (blanket policy of strip searching all

_____

[6]The court notes that the Eleventh Circuit, sitting in banc to rehear an appeal of a case striking down a strip search policy similar to that in Wilson, recently questioned its holding in Wilson that arrestees detained in the general jail population can constitutionally be subject to a strip search only if the search is supported by reasonable suspicion. Evans v. City of Zebulon, (continued...)

17

arrestees placed in general population violated the Fourth Amendment). The Ninth Circuit has stated that intermingling is a dubious reason for a strip search because it is inherently "limited and avoidable." Giles, 746 F.2d at 619.

Courts have repeatedly invalidated strip searches of arrestees that were placed in the general jail population based on the reasoning that less invasive searches or other detention practices could obviate the need for a strip search. For example, in Roberts v. State of R.I., the First Circuit struck down a policy requiring the strip search of all arrestees held in the general population at an intake facility considered to be maximum security. 239 F.3d 107 (1st Cir. 2001). The Roberts court held that the intermingling of arrestees with the general prison population, which was a product of the structure of Rhode Island prison system, "is not, in itself, dispositive of the reasonableness of the search." The First Circuit found that to "place so much weight on one (potentially alterable) characteristic of the state prison system would gut the balancing approach endorsed by the Supreme Court in Bell." Id. at 113.

In the instant case, defendant fails to cite any authority in support of its presumption that, contrary to the case law cited above, placing a detainee in the general jail population per se justifies a strip search. Instead, defendant states conclusorily that there is a "reasonable belief" that the person is carrying contraband whenever the person has been arrested on a warrant, but

---

[6](...continued)
407 F.3d 1272 (11th Cir. 2005) (en banc). The Evans panel stated, "Most of us are uncertain that jailers are required to have reasonable suspicion of weapons or contraband before strip searching for security and safety purposes – arrestees bound for the general jail population." Id. at 1278. The panel went on to observe the Supreme Court had never imposed such a "reasonable suspicion" prerequisite on inmate strip searches, but stopped short of resolving the accuracy of the panel's earlier statement. For now, the law in the Eleventh Circuit remains as stated in Wilson.

18

does not explain the basis of this presumption. Courts invalidating searches of misdemeanor arrestees have noted that arrestees are unlikely to have contraband hidden in their body orifices at the time of arrest. See, e.g., Shain v. Ellison, 273 F.3d 56, 64 (2nd Cir. 2001) ("arrestees do not ordinarily have notice that they are about to be arrested and thus an opportunity to hide something"); Thompson, 2005 WL 1950363 at * 8 ("[I]t is a relatively safe assumption    at least in absence of evidence to the contrary – that only a negligible portion of arrestees have concealed contraband in body cavities *prior to* their encounter with law enforcement.") (emphasis in original).

The Shain court distinguished its holding regarding misdemeanor arrestees from Bell's holding that it was reasonable to assume that prisoners might have hidden contraband after contact visits, noting that "[i]t is far less obvious that misdemeanor arrestees frequently or even occasionally hide contraband in their bodily orifices." Shain, 273 F.3d at 64. Because of the nature of unanticipated arrests, blanket strip search policies are also unlikely to have the deterrent effect relied on in part by the Supreme Court in Bell. As the Giles court noted, unlike visits to the detention center in Bell, which are planned and permit visitors an opportunity to organize their smuggling activities, "arrests and confinement...are unplanned events, so the policy could not possibly deter arrestees from carrying contraband." Giles, 746 F.2d at 617.

The logic of Shain and Giles concerning unsuspecting arrestees is particularly applicable to subclass I which, pursuant to the class definition, does not include arrestees whom defendant had reasonable suspicion or probable cause to believe were concealing contraband or weapons. Defendant might have reasonable suspicion to search a person arrested on an FTA warrant in a case involving contraband or weapons, or whose record otherwise indicated a reason to believe

19

he might be secreting items in his body cavities. Such arrestees, however, are not included in subclass I and plaintiffs do not challenge such searches. Nothing in this opinion limits the WCADF's ability to conduct strip searches based on reasonable individualized suspicion, but such individualized justifications are the antithesis of the blanket policy under attack.

The court does not diminish or doubt defendant's argument that all detainees must be searched in order to ensure the safety of everyone at the WCADF. Defendant does not argue, however, that people arrested on FTA warrants in misdemeanor or traffic cases are likely to have secreted contraband that can be uncovered only by a strip search, as opposed to a less invasive search such as a pat down. Defendant fails to present any evidence that contraband is often, or ever, recovered from FTA warrant arrestees, and does not point to any particular security risk that would be posed in the absence of strip searches.

Defendant also fails to explain why all arrestees who are detained at the WCADF must be held with the general jail population. If there were a compelling reason to place FTA warrant arrestees who do not post bond in the general jail population, the resulting intermingling of detainees might provide a constitutionally sound reason for the strip search. Instead of offering such a reason, defendant repeatedly points to overcrowding in the booking area and asserts that strip searches are required prior to intermingling with the general population jail in E-pod. As the cases discussed above make clear, administrative concerns such as "space constraints" are not sufficient to justify blanket strip search policies. See, e.g., Roberts, 239 F.3d at 113; Hill, 735 F.2d at 394-95. Defendant fails to explain why a third option that would protect arrestees' Fourth Amendment rights while furthering defendant's legitimate law enforcement objectives, such as separate holding cells for certain arrestees, is not possible.

20

Absent the proffer of any evidence to support its generalized claim of a security risk posed by members of subclass I or its claim that all detainees must be held with the general jail population, defendant has failed to create any triable issue of material fact that automatic post-arrest strip searches are justified for all warrant arrestees. See Thompson, 2005 WL 1950363, at *7 (defendant sheriff not entitled to summary judgment on reasonableness of strip search where it fails to present evidence of items found on newly arriving detainees); see also, Roberts, 239 F.3d at 112 (indicating that searching all inmates is more reasonable in cases in which the record reflects a history of problems with prisoners smuggling items into the institution).

"Bell has not been read as holding that the security interests of a detention facility will always outweigh the privacy interests of the detainees." Dobrowolskyj v. Jefferson County, 823 F.2d 955, 959 (6th Cir. 1987). As the First Circuit has noted, "the Fourth Amendment balance cannot be shifted so quickly." Roberts, 239 F.3d at 113. In the instant case, defendant suggests the placement of arrestees among the general jail population as the sole basis for security concerns. Defendant does not explain what other individuals are in the general population at the WCADF or what security risks they might pose, and defendant does not argue that individuals arrested on FTA warrants could be not held elsewhere. As the Roberts court noted, a prison system cannot rely on the realities of its own detention structure alone to justify an invasion of privacy as significant as a strip search. Id.

Because the court finds that defendant's blanket policy of searching all arrestees arrested on FTA warrants for misdemeanor or traffic violations violates the Fourth Amendment, the court grants plaintiffs' motion for summary judgment of liability as to subclass I.

## II.    Subclass II - Post-release search

In their subclass II claim, plaintiffs challenge defendant's policy of strip searching

individuals returned to the WCADF from court after being ordered released. Plaintiffs argue that

the automatic post-release searches are unconstitutional because they are not justified under Bell.

Defendant argues that after released arrestees return from court, processing the paperwork for

final release "could take three to four to six hours," and that due to overcrowding issues they

must be returned to the general jail population while they wait. According to defendant, once a

return to a cell is necessary, a strip search is required because the returnees were not under the

constant supervision of defendant while at court and they had contact with relatives and

attorneys. For the reasons discussed below, the court grants plaintiffs' motion for summary

judgment as to subclass II.

Beginning with Bell, courts "have given prisons far more leeway in conducting searches

of inmates with outside contact then in searching everyone, simply because such visits often

allow smuggling of contraband." Roberts, 239 F.3d at 111; see also, Shain, 273 F.3d at 63

("Unlike persons already in jail who receive contact visits, arrestees do not ordinarily have notice

that they are about to be arrested and thus an opportunity to hide something."); Masters, 872 F.2d

at 1253 (6th Cir. 1989) (citing the "obvious risk" that visits may be used to introduce contraband);

Thompson, 2005 WL 1950363, at *8 (distinguishing intake detainees from individuals searched

following contact with outsiders).

In Bell, as discussed above, the Supreme Court upheld the policy of searching pretrial

inmates after every contact visit. 441 U.S. at 560. The Supreme Court noted, however, that

some of the pretrial detainees in that case were facing serious charges and that the defendant

proved that in at least one instance during the institution's short history contraband was found during a body cavity search. Id. at 558. In the instant case, by contrast, plaintiffs were charged with misdemeanor or traffic violations only. The plaintiffs had been ordered released prior to being brought back to the WCADF and strip searched. Plaintiffs, as individuals for whom there is no longer any basis for detention, clearly have a privacy interest in their body parts which is as great, if not greater, than that of pretrial detainees. See Tinetti, Mary Beth G., supra. Moreover, as with subclass 1, defendant presents no evidence that a post-release strip search has ever discovered any contraband.

Plaintiffs argue that the instant case is analogous to Gary, which held that the defendant's "blanket policy of strip searching all court returns - including those who may proceed for release - was constitutionally suspect." 1998 WL 547116, at *12-13. In Gary, as in the instant case, there was no longer any basis for the detention of the plaintiffs at the time they were searched, and the only reason they returned to the jail – and strip searched – was to collect their property and to await processing. Id. at *14. The Gary court noted, "A simple change in the processing of the individuals in the plaintiff class would eliminate the problem." Id. at *14. Here, defendant admits that subsequent to September 15, 2004, returnees were given the option of remaining in the holding area and having facility personnel retrieve their personal belongings from the cell, or being allowed to return to their cell after consenting to a strip search.[7] The inmates who are not returned to their cells remain in the booking area while their release paperwork is completed. Defendant has therefore followed the Gary court's suggestion by instituting a simple change in

---

[7]Although defendant does not contest the admissibility of the change, the court notes that subsequent remedial measures are admissible to demonstrate feasibility. Fed. R. Evid. 407; Miles v.Badge #148 Baker, 1992 WL 14301, at *3 n. 7 (N.D.Ill. Jan. 17, 1992).

23

procedure, and has failed to provide any evidence that the change has compromised security at the WCADF or created unmanageable administrative burdens.

Defendant argues that Gary is factually distinguishable because the strip searches in that case were performed only on women, and were conducted in public areas. Id. at *2. It is true that there were troubling aspects concerning the place and manner of the strip searches in Gary that are not present in the instant case. Neither factor, however, was decisive in the Gary holding. Defendant also argues that Gary can be distinguished because the defendant there attempted to justify the searches almost exclusively by claiming administrative inconvenience because it had to process six to eight inmates on a daily basis. In addition, the defendant in Gary conceded that it could have processed the court returnees quickly, and that it was possible to discharge the women from the receiving room if they agreed to waive collecting their personal belongings from the cells and allowing the belongings to be brought to them. Id. at *14. The Gary court recognized that unsupervised contact by inmates presents a security concern upon return to the facility, but found this justification "substantially diminished" in that case because the defendant searched female inmates only, even though male inmates had the same degree of outside contact. Id.

Although the court agrees with defendant that Gary is factually distinguishable in some aspects, and that the holding in Gary "does not automatically invalidate the searches here," much of the Gary holding is analogous to the instant case and weighs in plaintiffs' favor. In the instant case, although defendant does not concede quite as much as the defendant in Gary, it also fails to offer any evidence of a genuine security concern posed by post-release detainees. Defendant asserts that it receives twenty to thirty returnees at a time, that there was already an overcrowding

24

problem in the booking area which increased the time for processing the releases of these individuals, and that this makes it less practicable for all of them to remain in the booking area. Essentially, defendant argues that it has no choice but to place the released returnees back in the general jail population. This claim, however, is belied by its own change in procedure in September 2004, which gives post-release detainees the option of remaining in the booking area.

As with its claims of security dangers pose by FTA warrant arrestees, defendant does not assert that the September 2004 change regarding released returnees has caused any administrative, security, or other problems, and fails to present any evidence to that effect. See, e.g., Arruda v. Fair, 710 F.2d 886, 887 (1st Cir. 1983) (a policy of searching all inmates is more reasonable when the record indicates a "lengthy history of contraband problems."). Defendant again attempts to use its own internal administrative procedures and practices to justify an alleged constitutional violation. This argument in equally unpersuasive regarding subclass II for the reasons discussed above regarding subclass I.

As discussed above, to survive constitutional scrutiny a blanket policy of performing strip searches, which are inherently invasive, must be balanced by a justification such as a genuine need to preserve institutional security. In the instant case, defendant has failed to create a triable issue of fact that the strip searches of post-release detainees are required to ensure the safety of the WCADF or that other procedures that impinged less on individuals' Fourth Amendment rights could not be instituted. Because the court finds that defendant's blanket policy of searching all post-release detainees who had been arrested on misdemeanor or traffic charges or on FTA warrants in misdemeanor or traffic charges violates the Fourth Amendment, the court grants plaintiffs' motion for summary judgment as to liability for subclass II.

25

### III. Motion to strike

Because the court did not consider any of the four paragraphs of plaintiffs' L.R. 56.1 statement that were challenged by defendant in granting summary judgement for plaintiffs, the court denies defendant's motion to strike as moot.

### CONCLUSION

For the reasons stated above, the court grants plaintiffs' motion for summary judgment as to liability as to subclass I and subclass II. The court denies as moot defendant Sheriff's motion to strike portions of plaintiffs' L.R. 56.1 statement.

**ENTER:**     **December 16, 2005**

_____

**Robert W. Gettleman**
**United States District Judge**

26